Filed 2/10/15  P. v. Evelyn D. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>EVELYN D.,<br><br>    Defendant and Appellant. | B248540<br><br>(Los Angeles County<br>Super. Ct. No. ZE037580) |

APPEAL from an order of the Superior Court of Los Angeles County, Elaine Mandell, Judge.  Affirmed.

Jean Matulis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle and Pamela C. Hamanaka, Deputy Attorneys General, for Plaintiff and Respondent.

_____\

Appellant Evelyn D. was charged with two counts of making criminal threats. (Pen. Code, § 422, counts 1 & 2.) She was found incompetent to stand trial, and was placed in a state hospital for a maximum commitment of three years. (*Id.* at §§ 1368, 1370.) Near the end of that period, the grand jury issued an indictment on counts 1 and 2 and the public guardian petitioned for conservatorship under the Lanterman-Petris-Short Act (LPS Act), Welfare and Institutions Code section 5000 et seq.[1] The superior court granted the petition under subdivisions (h)(1)(A) and (h)(1)(B) of section 5008. This appeal followed. Finding no error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellant, born in 1989, began experiencing psychiatric difficulties and auditory hallucinations in the eighth grade. At that time she dropped out of school. Between 2003 and 2010, appellant was in and out of psychiatric hospitals and juvenile detention facilities. She was diagnosed with unspecified psychotic disorders, major depression or depressive disorder, paranoid schizophrenia, bipolar disorder, schizophrenia, schizoaffective disorder, and oppositional defiant disorder.

At some point, appellant gave birth to a child who came to the attention of the Los Angeles County Department of Children and Family Services (DCFS). In July 2010, appellant allegedly left threatening telephone messages for two DCFS social workers. That resulted in a criminal complaint for making criminal threats, which was followed by the grand jury indictment. (Pen. Code, § 422; case No. ZM017261)

After doubts arose as to appellant's competency to stand trial, she was examined by Dr. Marc Cohen, a psychiatrist. He found she had a severe mental disorder, most likely a chronic psychotic disorder such as schizophrenia or schizoaffective disorder, which rendered her incompetent to stand trial. Based on Dr. Cohen's report, the superior

---

[1] Unless otherwise indicated, all further undesignated statutory references are to the Welfare and Institutions Code.

2

court determined that as a result of a mental disorder, appellant was incompetent to stand trial. (Pen. Code, § 1370.) Appellant was placed at Metropolitan State Hospital.

While detained at the hospital, appellant attempted suicide, behaved in a violent, threatening, and uncooperative manner, suffered auditory hallucinations, and hit her head against the wall until she bled. She was diagnosed with schizoaffective disorder, schizophrenia, and borderline personality disorder. She was treated with medications including Seroquel (antipsychotic), Depakene (mood stabilizing), Zyprexa (agitation), and Benadryl (agitation).

In February 2011, appellant was deemed sufficiently improved to be housed at county jail. However, her condition quickly deteriorated and she was returned to the state hospital. She later improved and was moved to county jail in July 2011. However, she again deteriorated and was returned to the state hospital. She was confined at Patton State Hospital until the end of the three-year period.

Efforts to return appellant to competency included psychotropic medications, psychotherapy, enhanced behavior treatments, and constant one-on-one monitoring. In April 2012, her treating psychiatrist, Dr. Rufino Co, provided the court with the following information: Appellant was still engaging in dangerous behaviors even while restrained. Her IQ scores in the 55 to 70 range reflected mild mental retardation.[2] The earlier diagnosis of a psychotic disorder was reconsidered. Dr. Co believed appellant was suffering from "a combination of Oppositional Defiant Disorder, Borderline Personality Disorder and Mental Retardation."

_____

[2] As noted in appellant's opening brief, the term "mental retardation" no longer appears in section 4512, which instead uses the term "intellectual disability." Under subdivision (a) of section 4512, "developmental disability" means "a disability that originates before an individual attains age 18 years, continues, or can be expected to continue, indefinitely, and constitutes a substantial disability for that individual," and includes "intellectual disability [formerly 'mental retardation'], cerebral palsy, epilepsy, and autism." For the sake of consistency, we adopt the term "mental retardation" as it appears in the record and briefs in this case.

In December 2012, Dr. Brian Betz, a neuropsychologist, reported that appellant had a full scale IQ of 56 and was "mildly mentally retarded." He noted that teachers and clinicians usually refer minors with mental retardation to a regional center for evaluation. Appellant did not receive such a referral. This might be explained by the fact that she came to California as an older child or adolescent, dropped out of school in eighth grade, and did not come to the attention of authorities until her criminal case was filed. Although Dr. Betz believed that appellant was properly diagnosed with schizoaffective disorder, intermittent explosive disorder, and oppositional defiant disorder, he attributed her difficulties primarily to mild mental retardation, which is a developmental disability. As a result, he believed she did not meet the criteria for grave disability under section 5150,[3] which applies to persons with mental illness rather than developmental disability.

In light of Dr. Betz's opinion that appellant did not meet the definition of grave disability under section 5150, the Los Angeles County Office of the Public Guardian (public guardian) informed the court that appellant was in need of continued services and housing in an appropriate facility. The public guardian requested that appellant be evaluated by the regional center for possible commitment proceedings under section 6500.[4]

Appellant moved to terminate jurisdiction based on Dr. Betz's report. After denying her motion, the superior court appointed Dr. Gordon Plotkin to conduct a "Murphy conservatorship" evaluation under Welfare and Institutions Code section 5008,

---

[3] Section 5150 provides for a 72-hour detention for treatment and evaluation of a person who, as a result of mental disorder, is a danger to himself or herself or others, or is gravely disabled.

[4] Section 6500, subdivision (b)(1) provides: "A person with a developmental disability may be committed to the State Department of Developmental Services for residential placement other than in a state developmental center or state-operated community facility, as provided in subdivision (a) of Section 6509, if he or she is found to be a danger to himself, herself, or others."

subdivision (h)(1)(B). A Murphy conservatorship applies to defendants who have been found incompetent to stand trial under Penal Code section 1370, have a pending felony charge involving death, great bodily harm, or a serious threat to the physical well-being of another person, and are presently dangerous.

Based on his examination and evaluation of appellant, Dr. Plotkin found that she satisfied the criteria for a Murphy conservatorship. He alternatively found that she possibly qualified for a conservatorship under section 6500 as a result of her mild mental retardation.

The superior court referred the matter to the public guardian for investigation of a possible conservatorship. The court granted the public guardian's petition for temporary conservatorship under the LPS Act.

The public guardian filed a petition for a one-year conservatorship under the LPS Act. (§ 5008, subds. (h)(1)(A) & (h)(1)(B).) At the trial on the conservatorship petition, Dr. Co testified to the following: Appellant has a mental illness that renders her incapable of providing for her own food, clothing, or shelter. She lost 50 to 60 pounds while hospitalized because she did not eat properly. She lacks insight into her mental illness, and is incapable of taking medications on her own. If she were to cease taking medications, she would become aggressive, leading to further problems and incarceration. She has no friends or family who can assist her; her mother was homeless and her father regularly traveled to Argentina. Her disability is too severe to be caused by mild mental retardation, and is primarily caused by mental illness.

Dr. Plotkin also testified at trial. With regard to Murphy conservatorship issues, he said appellant has mental disorders—schizo-affective disorder, psychotic disorder with occasional mood episodes, hallucinations, and schizophrenia—that cause her to be dangerous to others. While she was hospitalized, appellant assaulted other people by charging into them, swallowed foreign objects, and required constant monitoring and, at times, full bed restraints. She has little insight concerning her mental illness, is incapable

5

of taking medications without supervision, and has no reasonable alternatives to conservatorship.

Dr. Betz testified for the defense. He stated that appellant suffers from both mental illness and mild mental retardation, but the primary cause of her symptoms is mental retardation. He attributed 20 percent of her symptoms to schizoaffective disorder, 20 percent to oppositional defiant disorder, and 60 percent to mental retardation. Although appellant was diagnosed at a young age with a psychotic disorder, he was not aware that she had exhibited the depressive, muted, and vegetative behaviors that are typically seen in an adolescent with that condition. Because adults with mental illness can continue to function independently, he believed appellant's inability was caused by mild mental retardation. He agreed, however, that appellant needed a conservatorship to provide for her daily needs including medication. Without medication, appellant could become dangerous to others.

After considering the evidence, the court made the following findings: (1) appellant suffers from both a mental disorder and mild mental retardation; (2) without medication, appellant would decompensate and become dangerous to herself and others; (3) without a conservatorship, appellant would cease taking the medications needed to control her symptoms; and (4) without a conservatorship, appellant would be incapable of providing for her own food, clothing and shelter. After taking judicial notice that appellant was found incompetent to stand trial under Penal Code section 1370, and was under a present indictment for making criminal threats, the court found that she was gravely disabled within the meaning of both subdivisions (h)(1)(A) and (h)(1)(B) of section 5008. The court granted the petition for conservatorship, which would terminate on April 10, 2014. This timely appeal followed.[5]

---

[5] An order granting a conservatorship petition is appealable. (Prob. Code, § 1301, subd. (a); See *People v. Karriker* (2007) 149 Cal.App.4th 763, 773.)

6

**DISCUSSION**

Preliminarily, we consider whether the appeal is moot because the public guardian's appointment as conservator ended on April 10, 2014. Generally, an appeal is not moot if it raises issues that are capable of repetition but would otherwise evade review, or presents collateral consequences that would survive after the order has been terminated. (*Conservatorship of Carol K.* (2010) 188 Cal.App.4th 123, 133.) As both circumstances exist in this case, we conclude the appeal is not moot.

     A.     *Conservatorships Under the LPS Act*

"The LPS Act, which governs the involuntary treatment of the mentally ill in California, was enacted in order to end 'the inappropriate and indefinite commitment of the mentally ill, providing prompt evaluation and treatment of persons with serious mental disorders, guaranteeing and protecting public safety, safeguarding the rights of the involuntarily committed through judicial review, and providing individualized treatment, supervision and placement services for the gravely disabled by means of a conservatorship program.' (*Conservatorship of Susan T.* (1994) 8 Cal.4th 1005, 1009; see § 5001.)" (*County of Los Angeles v. Superior Court* (2013) 222 Cal.App.4th 434, 442 (*County of Los Angeles*).)

The first category of conservatorship under the LPS Act relevant to this case is the LPS conservatorship under subdivision (h)(1)(A). That provision applies where the conservatee is gravely disabled, meaning that he or she has a mental disorder that renders the conservatee unable to provide for his or her basic personal needs for food, clothing, or shelter. (§ 5008, subd. (h)(1)(A); *County of Los Angeles*, *supra*, 222 Cal.App.4th at p. 442.)

The second category relevant to this case is the subdivision (h)(1)(B), or Murphy conservatorship. It applies where "the conservatee is subject to a pending indictment or information charging him or her with a felony involving death, great bodily harm, or threat to the physical well-being of another; in which '[a]s a result of mental disorder,' the conservatee is unable to understand or meaningfully participate in the pending

7

criminal proceedings; and in which the conservatee has been found to be mentally incompetent under the procedures set forth in Penal Code section 1370. (Welf. & Inst. Code, § 5008, subd. (h)(1)(B).) To these three statutory requirements for the imposition of a Murphy conservatorship our supreme court has added a fourth: the constitutionally required finding that the conservatee is 'currently dangerous as the result of a mental disease, defect, or disorder.' (*Conservatorship of Hofferber* [(1980)] 28 Cal.3d [161,] 178.)" (*County of Los Angeles*, *supra*, 222 Cal.App.4th at pp. 442–443, fn. omitted.)

"Under Penal Code section 1370, subdivision (c)(1), a criminal defendant who is found incompetent to stand trial is subject to a commitment for a period not to exceed three years. Any further commitment is permitted only if the requirements for a conservatorship under one of the provisions of the LPS Act are met. (*People v. Karriker* (2007) 149 Cal.App.4th 763, 776.)" (*County of Los Angeles*, *supra*, 222 Cal.App.4th at p. 443.)

B.      *Penal Code Section 1370.1*

Appellant contends that because she has both a mental disorder and mild mental retardation (which she claims is a developmental disability),[6] she is ineligible for a Murphy conservatorship. Her theory is based on Penal Code section 1370.1, which applies to persons who are deemed incompetent as a result of a mental disorder and also have a developmental disability. (Pen. Code, § 1367, subd. (b).) Penal Code section 1370.1 provides that if such persons have not regained competence by the end of the

_____

[6] Appellant has not been formally adjudicated as a person with a developmental disability. According to subdivision (a) of section 4512, a "developmental disability" is a disability that "constitutes a *substantial* disability for that individual." (Italics added.) In this case, the expert witnesses disagreed whether appellant's disability was primarily caused by a mental disorder or mild mental retardation. By imposing a conservatorship under the LPS Act, which applies to those with a mental disorder, the court necessarily found that appellant's grave disability was caused by a mental disorder. The court did not find that appellant's intellectual disability constituted a substantial disability, or qualified as a developmental disability under section 4512.

commitment period, the court "shall notify the regional center director or designee and the executive director of the developmental center of that return and of any resulting court orders." (Pen. Code, § 1370.1, subd. (c)(1)(B).) Based on this statutory provision, appellant contends the court was required to refer her to the regional center for evaluation. We do not agree.

When doubts first arose as to appellant's competence to stand trial, she was evaluated by Dr. Cohen, who found she was incompetent due to mental illness. He did not find that she had a developmental disability. Based on Dr. Cohen's report, appellant was found incompetent due to a mental illness under Penal Code section 1370.

If a person found incompetent by reason of mental illness under Penal Code section 1370 fails to regain competence by the end of the commitment period, "and it appears to the court that the defendant is gravely disabled, as defined in subparagraph (B) of paragraph (1) of subdivision (h) of Section 5008 of the Welfare and Institutions Code, the court shall order the conservatorship investigator of the county of commitment of the defendant to initiate conservatorship proceedings for the defendant pursuant to Chapter 3 (commencing with Section 5350) of Part 1 of Division 5 of the Welfare and Institutions Code." (Pen. Code, § 1370, subd. (c)(2).) That is what happened in this case. Because appellant was found incompetent by reason of mental illness under Penal Code section 1370, the court was authorized to order the initiation of a Murphy conservatorship proceeding at the end of the three-year period. (Pen. Code, § 1370, subd. (c)(2).)

The superior court followed proper procedure for a defendant in appellant's situation. Contrary to appellant's assertion that the court lacked authority to require the public guardian to initiate a Murphy conservatorship proceeding, Penal Code section 1370, subdivision (c)(2) permitted the court to do just that. After receiving Dr. Betz's report, the public guardian initially requested a regional center evaluation. However, after appellant was examined by Dr. Plotkin, who found she was qualified for a Murphy conservatorship, the public guardian concurred with this finding and filed the necessary

9

petition. Accordingly, we distinguish this case from *People v. Karriker*, *supra*, 149 Cal.App.4th 763, in which the public guardian refused to file a conservatorship petition.

Appellant argues that when her mild mental retardation came to light during her hospitalization, the superior court was required to issue an immediate referral to the regional center.[7] Assuming that is true, we are not persuaded that appellant was prejudiced by the regional center's lack of involvement in her case. (See *People v. Leonard* (2007) 40 Cal.4th 1370, 1390–1391 [failure to refer defendant to regional center for evaluation constituted harmless error].) While an assessment and recommendation is being sought from the regional center, the court retains discretion to place a defendant who is mentally ill and dangerous in a state hospital under Penal Code section 1370.1, subdivision (a)(1)(B)(i). If such a defendant is committed to a state hospital, the court is obligated to periodically assess whether the appropriate level of security is being provided. (Pen. Code, § 1370.1, subd. (b)(4).) In light of appellant's severe symptoms, which necessitated one-on-one monitoring, medications and physical restraints, the state hospital was a reasonable placement and treatment choice, particularly in light of public safety concerns. We are aware of no argument made to the contrary during the three-year confinement period.

Appellant contends that because Penal Code section 1370.1 "does not authorize referral for conservatorship unless the criminal charges have been dismissed[,] . . . conservatorship based on Welfare and Institutions Code section 5008, subdivision (h)(1)(B) for a person with a developmental disability is not permissible." Although she provides no further explanation, we infer she is relying on the following language in subdivision (c)(2) of section 1370.1: "[I]n the event of dismissal of the criminal charges before the defendant becomes mentally competent, the defendant shall be subject to the applicable provisions of the Lanterman-Petris-Short Act (Part 1 (commencing with

---

[7] Appellant contends the issue was not forfeited in light of her motion to dismiss on the basis of Dr. Betz's report. We agree.

10

Section 5000) of Division 5 of the Welfare and Institutions Code), or to commitment and detention pursuant to a petition filed pursuant to Section 6502 of the Welfare and Institutions Code."

We read this language to mean that if a criminal case is dismissed *before* the defendant recovers competence, the defendant shall be subject to the *applicable* provisions of the LPS Act. The word "applicable" is significant.

As previously discussed, there are two kinds of long-term conservatorship under the LPS Act. The first, subdivision (h)(1)(A), or LPS, applies where the defendant has a mental disorder that renders him or her unable to provide for his or her basic personal needs for food, clothing, or shelter. An LPS conservatorship is available if a criminal case is dismissed before the defendant's competence is restored.

The second is a Murphy conservatorship, which is *not* available after the criminal case is dismissed. The main purpose of a Murphy conservatorship is to protect public safety. "The provisions for Murphy conservatorships were added to the LPS Act in order to distinguish between persons who do, and do not, present a danger to the public. They are intended to 'address the difficult problem of integrating and resolving the conflicting concerns of protecting society from dangerous individuals who are not subject to criminal prosecution,' while 'preserving a libertarian policy regarding the indefinite commitment of mentally incompetent individuals who have yet to be convicted of criminal conduct, and safeguarding the freedom of incompetent criminal defendants who present no threat to the public.' (*People v. Skeirik* (1991) 229 Cal.App.3d 444, 456; see *Karriker*, *supra*, 149 Cal.App.4th at p. 775.) For a conservatee under subdivision (h)(1)(A) of section 5008, the court is required to place the conservatee in the least restrictive available placement. (§ 5358, subd. (a)(1)(A).) However, for a conservatee who meets the 'gravely disabled' definition of subdivision (h)(1)(B) of section 5008, the priority is public safety, not the least restrictive available placement. The placement must be one 'that achieves the purposes of treatment of the conservatee and protection of the public.' (§ 5358, subd. (a)(1)(B); see *Karriker*, *supra*, 149 Cal.App.4th at p. 778.) As the public

11

guardian put it, '[i]n an LPS conservatorship the primary focus is least restrictive placement and in a Murphy conservatorship it is the protection of the public.'" (*County of Los Angeles*, *supra*, 222 Cal.App.4th at p. 445.)

Appellant's assertion—that the court had no authority to impose a Murphy conservatorship because she falls under the provisions of Penal Code section 1370.1—is not well taken. As we have discussed, the court was authorized to impose a Murphy conservatorship because appellant was found incompetent by reason of mental illness under Penal Code section 1370, which authorizes the initiation of a Murphy conservatorship proceeding at the end of the three-year period. (Pen. Code, § 1370, subd. (c)(2).)

C.      *Substantial Evidence Supports the Finding of Grave Disability*

"In reviewing a conservatorship, we apply the substantial evidence standard to determine whether the record supports a finding of grave disability. The testimony of one witness may be sufficient to support such a finding. (*Conservatorship of Johnson* (1991) 235 Cal.App.3d 693, 697.) We review the record as a whole in the light most favorable to the trial court judgment to determine whether it discloses substantial evidence. Substantial evidence, which is evidence that is reasonable, credible, and of solid value, also includes circumstantial evidence. [Citation.]" (*Conservatorship of Carol K.*, *supra*, 188 Cal.App.4th at p. 134.)

Substantial evidence supports the superior court's finding of grave disability under section 5008. Hospital records and testimony strongly indicated that appellant suffered from a mental disorder that rendered her incapable of providing for her food, clothing, or shelter. By all accounts, appellant was incapable of taking her required medications. Without those medications, it was inevitable that appellant would be dangerous to herself and others. There was no better alternative to conservatorship.

Appellant argues that she is entitled to the least restrictive available placement, such as an involuntary commitment under section 6500. (See *People v. Barrett* (2012) 54 Cal.4th 1081, 1108 [section 6500 applies to persons who are dangerous because of

12

mental retardation].)  However, the public guardian did not pursue a commitment under section 6500 after Dr. Plotkin found that appellant was eligible for a Murphy conservatorship.  Where, as here, a defendant satisfies the criteria for a Murphy conservatorship, the court is obligated to focus on the protection of the public rather than the least restrictive placement.  (*County of Los Angeles*, *supra*, 222 Cal.App.4th at p. 445.)

Dr. Plotkin's alternative finding—that appellant might be eligible for an involuntary commitment under section 6500—does not entitle appellant to a reversal of the Murphy conservatorship order.  Appellant's reliance on *People v. Cuevas* (2013) 213 Cal.App.4th 94 is misplaced.  In that case, the court did not consider whether a commitment under the LPS Act might have been justified.  (*Id.* at p. 108, fn. 11.)  Instead, the *Cuevas* court reversed the defendant's commitment under section 6500 for insufficient evidence that his disability was substantially caused by mental retardation.  (*Id.* at p. 108.)  That decision does not assist appellant, whose conservatorship under the LPS Act was based on a finding of mental illness for which there is substantial support in the record.

## DISPOSITION

The order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPOR**TS

EPSTEIN, P. J.

We concur:

WILLHITE, J.                          COLLINS, J.

13